**Below is a Memorandum Decision of the Court.**

*Mary Jo Heston*

**Mary Jo Heston**
**U.S. Bankruptcy Judge**
**(Dated as of Entered on Docket date above)**

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF WASHINGTON AT TACOMA

| | |
|---|---|
| In re:<br><br>HEATHER ANN COPLIN,<br><br>          Debtor. | Case No. 13-46108 |
| HEATHER ANN COPLIN,<br><br>          Plaintiff,<br><br>     v.<br><br>US DEPARTMENT OF EDUCATION;<br>TRANSITIONAL GUARANTY AGENCY;<br>WELLS FARGO BANK, N.A.; ECMC;<br>UNIVERISTY OF THE PACIFIC;<br>UNIVERSITY OF WASHINGTON; SALLIE<br>MAE,INC; NAVIENT CREDIT FINANCE<br>CORP.; NORTHWEST EDUCATION LOAN<br>ASSOCIATION<br>          Defendants. | Adversary No. 16-04122<br><br>**MEMORANDUM DECISION<br>(NOT FOR PUBLICATION)** |

This matter came before the Court for trial on October 31, 2017, on the complaint filed by Heather Ann Coplin ("Plaintiff") seeking discharge of her student loan debt pursuant to 11

MEMORANDUM DECISION - 1

U.S.C. § 523(a)(8).[1] The Plaintiff commenced this adversary proceeding on October 5, 2016, following completion of her Chapter 13 plan. The Plaintiff's Chapter 13 case was filed on September 27, 2013, with a plan of reorganization confirmed on November 26, 2013. The confirmed Chapter 13 plan provided for monthly payments of $80 for 36 months and promised no dividend to general unsecured creditors. The Plaintiff was represented by counsel in the Chapter 13 proceedings and received a full compliance discharge on October 6, 2016.

The Plaintiff appeared *pro se* in this adversary. Defendants Educational Credit Management Corporation ("ECMC"); the United States Department of Education ("DOE"); University of the Pacific ("Pacific"); and Navient Credit Finance Corporation ("Navient") appeared through counsel. Prior to the start of the trial, the Plaintiff and Navient entered into a stipulation to discharge the Navient loans and dismiss the complaint as to Navient and Sallie Mae, Inc. (Order Apprv. Stip., ECF No. 64). With the exception of Navient and Sallie Mae, the Court will refer to the remaining student loan creditors collectively as "the Defendants" except where necessary for clarity.

Following testimony by the Plaintiff, the Plaintiff''s fiancé Theodore Rohde ("Rohde"), and Cristin O'Keefe, DOE's loan specialist, the Court took the matter under advisement. Based on the evidence admitted, arguments of the parties, and pleadings submitted, the Court determines that the Plaintiff is granted a discharge of her student loan debt to the extent it exceeds $222,000. In support of its determination that a portion of the Plaintiff's student loans constitutes an undue hardship, the Court makes the following findings of fact and conclusions of law.

---

[1] Unless otherwise indicated, all chapter, section and rule references are to the Federal Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

MEMORANDUM DECISION - 2

**FINDINGS OF FACT**

A. <u>Personal and Professional History</u>.

In 2003, the Plaintiff received an associate degree from Whatcom Community College. Two years later, in 2005, the Plaintiff received a B.A. in Political Science from the University of Washington and started law school that same year. In 2009, the Plaintiff received a Juris Doctor from University of the Pacific's McGeorge School of Law. Unfortunately, the Plaintiff's law school education did not result in the kind of lucrative legal employment the Plaintiff likely expected because of her family and personal situation described in detail below.

The Plaintiff is a 45-year-old single mother of seven children. At the time of trial five of her children under the age of 18 resided with Plaintiff. Four of these children are disabled. Three of the disabled children were born significantly prematurely just as the Plaintiff was completing law school. The Plaintiff, with the help of Rohde, provides most of the daily care for her children except for eight hours a week of after-school assistance and some respite care provided by the State of Washington. The Plaintiff is bi-polar and has made several suicide attempts. Despite the lack of childcare, her own medical issues and the needs of her children, the Plaintiff has consistently held some form of employment for most of the time since leaving school. (DOE Ex. 6 at 26-27). Currently, Plaintiff is employed for about 30 hours a week as a waitress on a night shift at a local casino.

The Plaintiff's triplets were born significantly prematurely in 2009. (DOE Ex. 6 at 19). The triplets suffer from a variety of health problems resulting in extensive medical and psychological needs. The Plaintiff's daughter (second of the triplets) is unable to walk and currently moves on her knees when around the house and otherwise uses an electric wheelchair for mobility. This child is incontinent and generally unable to care for herself. She also cannot read, write, or count to 100. After birth, the daughter required a shunt to drain spinal fluid and suffers from repeated seizures. The Plaintiff testified that she believes based

MEMORANDUM DECISION - 3

on her experience over the past eight years that her daughter will never be self-sufficient due to mental and physical limitations.

The two male triplets also suffer from significant health problems and delayed learning issues. Since birth, one of these children also has required a spinal shunt. Both of these children suffer from muscular issues impairing mobility, and each has varying levels of cognitive, physical and  sensory abilities and serious medical issues. (DOE Ex. 6 at 22-23).

The Plaintiff also has a 15-year-old son who suffers from severe behavioral issues, likely related to autism. (DOE Ex. 6 at 18-19). This child has sensory problems, including auditory and visual hallucinations, that interfere with his ability to interact and function during school and sometimes make him violent. This child is over six feet tall and weighs over 340 pounds. The Plaintiff is required to attend regular counseling sessions, intervene during school hours to address anxiety-induced acting-out behavior, and has called the police on several occasions to deal with her son's aggressiveness. At trial, the Plaintiff testified that despite some improved behavioral changes overall resulting from significant social worker involvement, her son struck Rohde the week prior requiring police intervention.

Following the triplets' premature births, the Plaintiff spent considerable time in the hospital to address the numerous health issues with the children, including emergency room visits. For the period from 2009 through the present, the Plaintiff has regularly attended numerous medical emergency and non-emergency appointments for her children averaging six to seven every week. These medical appointments together with her difficulties in finding affordable and competent child care have made it extremely difficult, if not impossible, for Plaintiff to work lucratively as an attorney or to work any kind of a job during the day. The Plaintiff testified that it is unclear what the future medical, emotional and other care needs of her three disabled sons will be after they reach the age of majority and finish their schooling and other treatment.

Since graduating from law school Plaintiff has attempted to secure profitable employment while at the same time provide safe and competent childcare with varying degrees of success. For a short period of time following law school, for example, the Plaintiff's then ex-husband was unemployed and cared for the children at home. However, since her divorce in November 2012, the Plaintiff has struggled to find suitable care given the needs of her children. Although all five of the children currently living with the Plaintiff attend public school during the day, Plaintiff credibly testified that short-term childcare is still necessary after school for five days of the week to handle all of the appointments and needs of her four disabled children.

From 2009 to 2012, the Plaintiff worked for a number of legal entities as a paralegal because she did not pass the Washington State bar exam until the summer of 2012. Following bar passage, the Plaintiff continued to work as an associate attorney for a law office. After several years of working as an associate, the Plaintiff decided to open her own law firm when it became apparent she was not on an advancement track that would likely improve her financial situation. Unfortunately, the Plaintiff's solo venture proved unsuccessful despite attempts to increase revenue through volunteer and reduced-fee legal work through the Tacoma-Pierce County Bar Association. The Plaintiff closed her law practice in 2015 and is attempting to complete her representation of one final client. She hopes to reopen the law practice if able to do so in the future, subject to her children's ongoing medical needs and care requirements.

In addition to her work in the legal field, the Plaintiff has endeavored to make money in other jobs. For several months in 2016 the Plaintiff was either unemployed or working as a pizza delivery driver for Domino's Pizza. The Plaintiff ceased working as a delivery driver when her vehicle insurance threatened to drop her. At some point during this time period, the Plaintiff also attempted to make money as an Uber driver and obtained a real estate broker's

license. The Plaintiff has received modest real estate commissions on at least two occasions from the sale of properties. Finally, in early 2017, the Plaintiff began working part time as a waitress at the Muckleshoot Casino and was employed there at the time of trial. Although Plaintiff's Juris Doctor is not necessary for work as a waitress, the Plaintiff credibly testified that Muckleshoot offers her better pay and benefits, as well as better hours, than any of her previous work based on the needs of her children. Crucially, the Plaintiff's present employment offers health insurance to cover substantially all of the medical expenses of herself and her minor children when combined with both Medicaid benefits and her ex-husband's insurance, which covers some of the children.

The Plaintiff met Rohde, who is a retired U.S. Airforce Master Sargent, in 2013. Rohde currently is employed by a waste transportation company. The Plaintiff and her dependent children moved into a house Rohde bought in 2016, and he provides childcare at night when Plaintiff is working at her current job. Rohde testified that he fell about one and one-half months behind on the house payment in connection with a refinance effort, and to date has not been able to catch up. Rohde and the Plaintiff have rescheduled their wedding date three times, with the current date set in fall 2019.

The Plaintiff was in a car accident on March 29, 2017, in which her older Prius was totaled and she suffered some soft tissue injury, which has resulted in the need for physical therapy, massage and physical exercise to develop core strength (i.e., Pilates). She then purchased a 2015 Prius to have efficient and reliable transportation for her current night job.

B. Assets, Income and Expenses.

The Plaintiff currently receives an annual tax refund, which for 2015 was $5,803, and for 2016 was $6,421. (DOE Ex. 7). The Plaintiff testified that the tax refunds have typically been used for larger items including car repairs or down payments on cars, and home

MEMORANDUM DECISION - 6

improvements to increase energy efficiency as well as safety and accessibility for her physically disabled children.

The Plaintiff does not own any real property. She has two vehicles: a 2000 GMC Safari van used to transport her family to medical, school and other appointments, and a 2015 Prius, which she purchased following her car accident in which a newer Prius was totaled. The Plaintiff testified that she will likely need to replace the van in the near term because of its age and the need for a wheelchair accessible vehicle to transport her daughter, who is becoming too heavy for the Plaintiff to lift.

The only other potential asset available to the Plaintiff is her recovery from the auto accident. Although the Plaintiff is represented by an attorney to pursue her claims arising out of the auto accident, she testified that her counsel was unable to provide an estimate of potential recovery.

At trial the parties presented documentary evidence and testimony regarding the Plaintiff's income and expenses. Testimony was also elicited as to Rohde's income contributed for certain of the Plaintiff's expenses. The Court finds that the testimony of the Plaintiff and Rohde is both credible and sufficiently reliable for the Court to adopt the income and expenses as testified to at trial. From the evidence submitted, the Court determines that the Plaintiff's individual monthly income and expenses that she currently pays are as follows:

| Plaintiff's Income | Source | Plaintiff's Expenses | Expense Item |
|---|---|---|---|
| $2,472.25 | Net income after payroll deductions | $497 | Vehicle payment for 2015 Prius[2] |
| $2,566.66 | SSI & Child Support for children | $400 | Childcare |
| $535.00 | Amortized tax refund of $6,420 | $1,200 | Groceries (not including meals eaten outside of the home) |

---

[2] The Plaintiff purchased this vehicle in April 2017, after filing her complaint against the Defendants but prior to the trial. The Court will consider the vehicle payment as part of the Plaintiff's present expenses as of the date of the trial.

MEMORANDUM DECISION - 7

| | | | |
|---|---|---|---|
| | | $110 | Gas for vehicles |
| | | $142 | Amortized amount for clothing |
| | | $70.83 | Co-pays |
| | | $500 | Amortized Utilities |
| | | $200 | Cable television (inc. HBO, STARS, Showtime and DVR) and landline |
| | | $50 | Personal Care |
| | | $20 | Prescriptions |
| Total Income: $5,573.91 | Income w/o tax refund: $5,038.91 | Total Expenses: $3,189.83 | Net income w/o tax refund: $1,849.08 |

For his part, Rohde makes approximately $3,500 net after payroll deductions from his current employment and also receives Air Force retirement pay of $356.74 after deductions for child support for his dependent children. Rohde maintains separate bank accounts from the Plaintiff, and the Plaintiff does not have access to these accounts. Rohde also testified that he had other expenses of his own, including approximately $562 a month for expenses related to his own personal creditors and expenses related to his own children from a prior marriage. However, the additional expenses were not detailed and Rohde's bank accounts were not put into evidence.

The evidence does clearly show, however, that Rohde pays several of the Plaintiff's larger fixed expenses as follows:

| Plaintiff's Expenses Covered by Rohde's Income | Expense Item |
|---|---|
| $1,850 | Mortgage (in Rohde's name only) |
| $11 | Gas utility line |
| $369.00 | Car Insurance for 3 drivers and 4 vehicles |

MEMORANDUM DECISION - 8

| | |
|---|---|
| $354.54 | Cellphones (3 phones, 2 tablets and 1 smartwatch) |
| Total $2,584.54 | |

The foregoing expenses were confirmed at trial by the Plaintiff and Rohde. However, the Plaintiff also testified that certain unexpected, necessary, non-regular expenses for her household were not represented because they fluctuated on a monthly basis. In their pre-trial briefing, the Defendants challenged certain of the Plaintiff's expenses, including fast food expenses, vacation expenses, cable, massages and Pilates. However, at trial, cross-examination on these expenses was somewhat limited, and the responses of both Rohde and the Plaintiff showed that her expenditures are generally reasonable under the unusual circumstances of the Plaintiff's personal and family situation. For example, the Plaintiff testified that she often needed to feed her children while visiting medical and other required appointments and fast food was the only readily available source. The Plaintiff also testified that both the massages and Pilates were recommended following her car accident and that the weekly massage expense was now paid by insurance. Additionally, the Plaintiff testified that the family had taken only one vacation to visit her parents and that other trips had largely been paid for by relatives. Finally, the Plaintiff indicated that cable television was the family's only real means of entertainment.

In addition to specific expenses, the Plaintiff testified to additional non-recurring expense amounts for upgrades to the house purchased by Rohde in 2016 to reduce energy costs and to accommodate her children's physical disabilities, and for other generalized expenses related to vehicles, meals outside the home while taking children to medical appointments, and the need for emergency savings. As with the specific expenses already outlined, the Court finds the testimony of the Plaintiff and Rohde credible and does not doubt the need for flexibility in the monthly budget. Many of the additional expenses referenced by

MEMORANDUM DECISION - 9

the Plaintiff at trial are corroborated by the bank records admitted into evidence. (DOE Ex. 8, 9). A review of the ending cash balances contained in the Plaintiffs' bank statements for the period of November 2015 through April 2017 confirms that on average the Plaintiff has an ending cash balance at the end of each month of around $1,400[3] exclusive of the tax refunds, with actual monthly ending cash balances varying between $403.53 and $6,705.38 in the personal account. The business account reflects a much smaller variation, with some months showing a negative balance. The bank records confirm that the Plaintiff's unbudgeted and unexpected expenses vary from month to month and more closely align with the somewhat higher expenses contemplated by the National and Local Standards for this size of a family than the amounts testified to by the Plaintiff. The National and Local Standards used in bankruptcy cases are based on the IRS Collection Financial Standards and appear in other provisions of the Bankruptcy Code.[4] While not determinative in student loan discharge hearings, the IRS Collection Financial Standards are helpful to the Court in this instance because of the limitation to "expenses that are necessary to provide for a taxpayer's (and his or her family's) health and welfare and/or production of income," which has some similarity to the minimal standard of living discussed *infra*.[5]

C. <u>Student Loans, Deferrals, Bankruptcy and Loan Payments</u>.

During the course of the Plaintiff's post-secondary education she incurred approximately $484,964.77 of federally guaranteed educational loans, including accrued interest.[6] Prior to the start of trial, Navient entered into a stipulation with the Plaintiff to include

---

[3] This figure was arrived at by taking the ending cash balances for both the Plaintiff's personal and business accounts, deducting the tax returns and $3,727 of non-recurring amounts for home improvements, which the Plaintiff testified come out of the tax returns, and dividing the balance by the number of months available.
[4] <u>See</u> § 707(b)(2)(A)(ii)(I)
[5] United States Trustee, <u>General Information Regarding IRS Collection Financial Standards</u>, available at, https://www.justice.gov/ust/means-testing/20171101 (last visited Nov. 22, 2017).
[6] The Court calculated this figure based on the documentary evidence received by Defendants at trial. *See* Navient Stipulation, ECF No. 62; O'Keefe Test.; Pacific Ex. 5; ECMC Ex. 3). However, defendant ECMC did not

MEMORANDUM DECISION - 10

the $68,967.58 owed to Navient and Sallie Mae in the Plaintiff's Chapter 13 discharge. (Navient Stip., ECF No. 62). Therefore, the approximate loan balance at the time of trial for the remaining three Defendants was $415,997.19.

Since graduating from law school in late 2009, the Plaintiff has made certain efforts to avoid defaulting on her student loan obligations. Between 2009 and 2013, the Plaintiff took advantage of the deferment and forbearance options available for her federal loans. The Plaintiff also used an interest-only payment option available from her private lenders under a hardship program from 2010 until she defaulted on the payments in 2012. In 2013, the Plaintiff filed a Chapter 13 bankruptcy case and obtained confirmation of a plan of repayment. From 2013 until the completion of her Chapter 13 plan payments in October 2016, the student loan creditors also received payments from the bankruptcy trustee. All told, the Plaintiff has paid the Defendants approximately $2,242.99, with the majority of these payments made through the Chapter 13 plan. (DOE Ex. 1A; Pacific Ex. 5; ECMC Ex. 8). [7]

Although the Plaintiff is eligible to enroll in an income-based repayment plan ("IBR") for the amounts owed to ECMC and DOE, she testified that she was not participating in the program at the time of trial and had not utilized the program previously because: 1) the IBR payments of $0.00 did not provide any benefit (i.e., did not reduce the amount owed) and could lead to tax liability at the end of the repayment period, and 2) the two private loans were in also in default and not part of the IBR program. Under these IBRs, the Defendants produced evidence that the Plaintiff's payments based on her current income would be $0. In

---

provide evidence of the precise loan balance as of the time of trial and its documentary evidence is current as of January 25, 2017. (ECMC Ex. 3).

[7] ECMC did not provide the exact amount of the payments it has received from the Plaintiff, or a total balance through the date of the trial. The Court calculated the total payments by adding the items described as "PY-Payment" in the ECMC account ledger, admitted as ECMC Ex. 8, to the $1,133.00 of payments described in the testimony and exhibits presented by DOE and Pacific. The total loan figure was calculated off of ECMC's total owed of $210,924.48 through January 25, 2017. (ECMC Ex. 3).

MEMORANDUM DECISION - 11

making this determination, Rohde's income is apparently not included, since Plaintiff and Rohde are not currently married.[8]

## CONCLUSIONS OF LAW

The Bankruptcy Code excepts from a debtor's discharge any qualified educational loan, unless the debtor establishes by a preponderance of the evidence that repayment of such loan would "impose an undue hardship on the debtor and the debtor's dependents . . . ." § 523(a)(8); Nys v. Educ. Credit Mgmt. Corp. (In re Nys), 308 B.R. 436, 441 (9th Cir. BAP 2004), aff'd on other grounds, 446 F.3d 938 (9th Cir. 2006). The Code does not define "undue hardship," requiring the courts to develop a variety of factors to distinguish between garden-variety hardships and those circumstances that in fact warrant relief from student loan debt. See Rifino v. United States (In re Rifino), 245 F.3d 1083, 1087 (9th Cir. 2001). The Ninth Circuit Court of Appeals has adopted a three-part test for bankruptcy courts to apply when conducting the undue hardship analysis. United Student Aid Funds Inc. v. Pena (In re Pena), 155 F.3d 1108, 1111-1112 (9th Cir. 1998) (adopting test set forth in Brunner v. New York State of Higher Educ. Servc. Corp. (In re Brunner), 46 B.R. 752, 753 (S.D. N.Y. 1985), aff'd 831 F.2d 395 (2d. Cir. 1987)). The Brunner test requires a plaintiff to prevail on three separate inquiries:

1) The debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans;
2) Additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and
3) The debtor has made good faith efforts to repay the loans.

Pena, 155 F.3d at 1112 n.4. The plaintiff must meet all three prongs to successfully establish the dischargeability of a student loan. Rifino, 245 F.3d at 1087-88. The court may grant a

---

[8] 34 C.F.R. § 682.215(a)(1).

MEMORANDUM DECISION - 12

partial discharge of a debtor's student loan after determining, based on the parties' evidence, whether the debtor can afford to pay all, part, or none of the student loan debt without undue hardship. Carnduff v. U.S. Dept. of Educ. (In re Carnduff), 367 B.R. 120, 133 (9th Cir. BAP 2007). "Debtors have the burden to prove all three prongs of *Brunner* 'as to the *portion* of the debt to be discharged.'" Carnduff, 367 B.R. at 133 (quoting Saxman v. Educ. Credit Mgmt. Corp. (In re Saxman), 325 F.3d 1168, 1174 (9th Cir. 2003)).

Before applying the Brunner test to the facts of this case, it is important to recognize the changes in student loan law since the time the test was first announced some three decades ago. At the time Brunner was decided in 1987, a debtor could discharge a student loan obligation in two ways: (1) a showing that the loan obligation came due more than **five years** prior to the bankruptcy petition, or (2) that excepting the loan from discharge would impose an undue hardship on the debtor and the debtor's dependents. (Pub. L. No. 96-56, § 3, 93 Stat. 387, 387 (Aug. 14, 1979)). A subsequent amendment to § 523(a)(8) extended the time for a loan to have entered repayment to seven years preceding the petition date. However, in 1998 Congress chose to limit student loan relief solely to cases of undue hardship in order to eliminate any discharge for older student loan obligations. (Higher Educ. Amends. Of 1998, Pub. L. No. 105-244, Title IX, Part G, § 971(a), 112 Stat. 1837 (Oct. 7, 1998)). At the time Brunner was decided, only debtors who were either unwilling or unable to wait the five years necessary requested an undue hardship discharge of their student loan obligations.

This Court is not the first to recognize the drastically different landscape for student loan debtor from the time when Brunner was decided. See Price v. United States Dep't of Educ. (In re Price), 573 B.R. 579, 598 (Bankr. E.D. Penn. 2017) (citing Roth v. Educ. Credit Mgmt. Corp. (In re Roth), 490 B.R. 908, 921 (9th Cir. BAP 2013)(Pappas, J., concurring)). Although the Court is required to follow binding Ninth Circuit precedent, the Brunner test is far

from the formulaic analysis suggested by the Defendants. Therefore, the Court's application of the Brunner standards is with an understanding that student loans debts are somewhat different than those faced by debtors of 30 years ago.[9]

A. Current Financial Situation and Ability to Pay.

The first prong of the Brunner inquiry is the Plaintiff's ability to maintain a "minimal standard of living" based on current income and expenses if forced to repay the loans. The debtor must show more than "tight finances" but is not required to prove "utter hopelessness." In re Nascimento, 241 B.R. 44, 445 (9th Cir. BAP 1999). Although a debtor is not required to "live in abject poverty," the minimal standard of living in § 523(a)(8) "'does not equate to a middle class standard of living' either." Educ. Credit Mgmt. Corp. v. Beattie (In re Beattie), 490 B.R. 581, 586 (W.D. Wash. 2012) (quoting In re Howe, 319 B.R. 886, 889 (9th Cir. BAP 2005)). However, some modest amount of diversion or recreation is permitted as part of a minimal standard of living. In re Ivory v. United States (In re Ivory), 269 B.R. 890, 899 (Bankr. N.D. Ala. 2001).

It is in the court's discretion to determine the method to calculate a debtor's average monthly expenses. Educ. Credit Mgmt. Corp. v. Mason (In re Mason), 464 F.3d 878, 882 n.3 (9th Cir. 2006). The court also has discretion to minimize or eliminate expenses that are not reasonably necessary to maintain a minimal standard of living. Berchtold v. Educ. Credit Mgmt. Corp. (In re Berchtold), 328 B.R. 808, 814 (Bankr. D. Idaho 2005). The court is not required to arrive at a "precise figure" in order to determine whether a debtor has satisfied the first Brunner prong. Beattie, 490 B.R. at 587.

The Defendants argue that the Court should include the total income and expenses of both Rohde and the Plaintiff in making its determination under this prong. The Defendants

---

[9] Daniel A. Austin, The Indentured Generation: Bankruptcy and Student Loan Debt, 53 Santa Clara L. Rev. 329, 335-336 (2013) (describing rapid growth in the amount of debt, number of students borrowing, and total education cost between 1989-2010).

MEMORANDUM DECISION - 14

also argue that the Court is required to make a determination of a minimal standard of living by utilizing the payment a debtor is eligible for under any of the government's IBR programs, regardless of whether the debtor is actually enrolled in such a program.[10]

    1. *Rohde's Income and Contribution to the Plaintiff's Expenses*

The Court acknowledges that authority exists to support the Defendants' use of Rohde's entire net income in the calculation of the Plaintiff's current financial picture, especially where the debtor is either married or living in what is essentially a marital-type relationship. See In re Sederlund, 440 B.R. 168, 172-73 (8th Cir. BAP 2010) (income of debtor's long-term boyfriend properly considered); Beattie, 490 B.R. at 587 (seasonal income of spouse included). Admittedly, this argument has some appeal because the Plaintiff and Rohde have allocated the household expenses between the two of them. In this instance, however, the Court will only include Rohde's income to the extent he contributes it in payment of $2,584.54 of the Plaintiff's expenses. (See p. 8, *supra*).

Excluding the remainder of Rhode's income and expenses from the calculation more fairly represents the Plaintiff's current financial situation. Although Rohde is the Plaintiff's fiancé, the couple have been engaged on two previous occasions but have yet to actually wed, with the earliest date now under consideration sometime in November 2019. The Plaintiff also testified that she does not have access to Rohde's bank accounts and knows little about his finances. In this sense, the Plaintiff and Rohde have not fully commingled their respective households. Furthermore, the testimony at trial failed to provide a complete picture of Rohde's unbudgeted expenses, including expenses for his own children and debts, leaving the Court with only a partial view of his financial obligations.

At the same time the evidence at trial did establish that the Plaintiff and Rohde have agreed to an allocation of expenses where the Plaintiff does not need to pay for certain larger

---

[10] Federal loans qualify for a variety of payment programs based on a debtor's income. 20 U.S.C. § 1098e(b). It is undisputed that Plaintiff's payment under any of these programs is $0.00. (ECMC Am. Trial Brief, ECF No. 54).

MEMORANDUM DECISION - 15

items covered by Rohde, such as her rent/mortgage, vehicle insurance, and cellular phones. At trial, there was no indication that the Plaintiff and Rohde intended to abandon the allocation of expenses between themselves now or in the future. Therefore, the Court concludes that including Rohde's income to the extent of payment of the Plaintiff's foregoing expenses provides an accurate financial picture of the Plaintiff's current ability to maintain a minimal standard of living. The Court's chosen methodology for calculating present financial circumstances does not exclude Rohde from the analysis entirely. Instead, Rohde's share of expenses are essentially imputed to the Plaintiff by limiting her to those expenses she actually pays without the need for the Court to rely on an incomplete picture of Rohde's finances.[11]

2. *Use of the IBR Payment*

Defendants ECMC and DOE offered testimony and documentary evidence during trial to establish that the Plaintiff not only qualifies for several IBR payment programs, but her monthly payments would be $0.00 if she were participating in one of the income options presented. Thus, ECMC and DOE argue that the Plaintiff cannot pass the first <u>Brunner</u> prong because the loans impose no payment obligation whatsoever. Pacific also uses the fact that Plaintiff is eligible for IBR payments, but argues that without the need to pay the two loans eligible for IBR, the Plaintiff can easily make the monthly payment of $148.50 owed on the Pacific loan. The Court rejects both of these argument for the reasons set forth below, as they ignore the particularities of this Plaintiff's situation as well as the applicable legal standards.

The court-developed undue hardship test attempts to balance the policies of making it difficult to discharge student loan debts against a debtor's need for a fresh start. IBR programs, on the other hand, are administrative programs developed to offer borrowers options to defer or reduce payments based on a certain portion of available income,

---

[11] It is interesting to note that the government programs do not even include Rohde's income to this extent.

calculated as a percentage of adjusted gross income less either 100 or 150 percent of the poverty level. Under the current IBRs, a borrower must certify the required information for the program each year, and any remaining balance left unpaid at the end of the program period, 25 years in this case, is forgiven. The problem with this approach is that unless circumstances change, these repayment plans may not result in the actual repayment of the loans, thereby creating the risk of a large tax bill on completion of the program, or a significantly higher loan balance if the borrower ceases or is denied participation in the program before the end of the 25-year period or the programs terminate.

IBR programs are payment structures created by Congress to help debtors with repayment of qualifying student loans. Congress could add additional payment programs, or even eliminate IBRs altogether if it chose to do so. Rather than supplanting a bankruptcy discharge, the IBR programs appear to serve a different purpose than § 523(a)(8). Federal IBR programs do not account for the total amount of loans owed in many cases. For debtors such as the Plaintiff, the loans negatively amortize during the repayment period and may effectively grow beyond what a student loan borrower could ever afford, although the borrower technically remains "current" on the obligation. While the Court does not discount the benefits of these programs for certain types of borrowers, such programs should not supplant the bankruptcy court's analysis under § 523(a)(8). Simply waiting for the loans to go away is contrary to the Ninth Circuit Bankruptcy Appellate Panel's (BAP) statement that the first Brunner prong must consider what it would take to actually pay the loans over the amortization period. Carnduff, 367 B.R. at 128.

A number of courts have considered IBR programs in applying the Brunner test, concluding that the IBR payment is the amount that plaintiff must show he or she cannot pay and still maintain a minimal standard of living. See Beattie, 490 B.R. at 588. This is the case regardless of whether the borrower is actually enrolled in an IBR program. One of the main

rationales for the use of the IBR payment program is found in the <u>Beattie</u> decision, where the court determined that to use the contract monthly payment would "yield an absurd result: almost every debtor would satisfy Prong 1 easily if courts were restricted to considering only the amount of [the debtor's] contract payment." <u>Beattie</u>, 490 B.R. at 588. The <u>Beattie</u> court went on to state that "Congress's creation of the flexible income-based repayment options . . . reflects an intent that debtors not be automatically or easily excused from their student loan obligations." <u>Id.</u> This analysis creates significant problems in the application of the <u>Brunner</u> test and ignores the high bar generally set by the <u>Brunner</u> test for establishing undue hardship. The logical fallacy in relying on the IBR payment amount is the assumption that it avoids the situation of every debtor-plaintiff passing the first prong of the <u>Brunner</u> test. The <u>Beattie</u> court failed to recognize what several other courts have, that using the IBR payment program results in most low income debtors, such as the Plaintiff, failing to pass the first prong, because if the debtor's financial circumstances are dire enough the payment is often $0.00. <u>Morrison v. Sallie Mae, Inc. (In re Morrison)</u>, No. 13-00933-FPC7, 2014 WL 73838, at * 4 (Bankr. E.D. Wash. Feb. 26, 2014). If Congress intended to create a student loan payment program that eliminated bankruptcy court discretion to discharge student loans as an undue hardship, it could have said so explicitly. <u>Morrison</u>, 2014 WL 73838, at * 4.

The IBR program is also limited to an income-side analysis of a Plaintiff's situation. It relies on adjusted gross income and the poverty limits to come up with a payment amount. For many debtors, such as the Plaintiff, the calculated IBR payment is little to nothing when based on gross income and assumed household expenses. With such a payment structure, many debtors would fail to pass the first <u>Brunner</u> prong simply because they technically can afford a payment of $0.00. If it were undisputed that a borrower's payments would remain at $0.00 for the entire IBR term, should the bankruptcy court tell the borrower to wait decades for relief? It is difficult to see how this advances either the policy of repayment of student loans or

the debtor's fresh start. This Court agrees with the reasoning in <u>Morrison</u> and determines that if Congress intended to supplant the student loan discharge provision of § 523(a)(8) with an annually-adjusting income-driven program it would have done so explicitly. Therefore, the Court holds that the payment required by prong one is the payment necessary to satisfy the entire outstanding loan balance over the remaining loan term.

   3. *The Plaintiff's Current Financial Circumstances*

   The Court has already determined that the appropriate inquiry in this circumstance is to look at the Plaintiff's current income and expenses, while including Rohde's income to the extent he pays the Plaintiff's expenses. At trial the Defendants produced testimony on cross-examination estimating that the Plaintiff's net income, without including the monthly amortized amount of the annual tax refund, is $1,850.[12]

   The Plaintiff testified that the budget she affirmed under cross-examination did not include all of her expenses, such as emergency savings and necessary repairs, meals outside of the home, or alterations to the house she lives in with Rohde. The Plaintiff also stated that she will require a wheelchair accessible van in the future in order to accommodate her daughters mobility needs. The Plaintiff's testimony is entirely credible as to the existence of the additional expenditures. However, simply because these expenditures are understandable in many instances, such as alterations to the railings on the stairwells to prevent injury to her children, this Court cannot permit the Plaintiff to claim certain unarticulated additional expenditures while also requesting the Court exclude the amortized amount of her tax refund. Historically, the Plaintiff has received tax refunds of approximately $6,000 per year. On a monthly basis, this is $500 of additional income that Plaintiff may use as needed. From the testimony and documentary evidence produced at trial, the savings, sudden expenses, and

---

[12] The Court arrived at this figure by rounding the net income of $1,849.08 up to $1,850.

MEMORANDUM DECISION - 19

need for a future van purchase are adequately covered by the tax refund amount. Therefore, the Court determines that the Plaintiff's net income, after providing a minimal standard of living for herself and her dependents, is $1,850.

The Plaintiff bears the burden of proving that her expenses and income are insufficient to ensure a minimal standard of living if forced to repay the student loans. It is not enough for a Plaintiff at trial to indicate that additional expenses exist that would turn an apparent surplus into a net loss without actually offering proof of those expenses. Although the Plaintiff has not established by a preponderance of the evidence that she is unable to pay something to her student loans, she has established that her net income is insufficient to pay the loans in full. With an approximate loan balance of $415,997.19 at the time of trial, it would require more than 225 months (18 years) to repay the current amount of the Defendants' loans if the Plaintiff committed her entire net income of $1,850 to the loans without any additional amount of interest accruing on the loans.[13] Once even a nominal amount of interest is included in the calculation, the amount necessary to repay the loans in full far exceeds the $1,850 available.[14] Therefore, the Plaintiff has met her burden to show she unable to pay the entire amount of the outstanding loans while maintaining a minimal standard of living based on her current financial situation.[15]

B. Persistence of the Current State of Affairs.

The second inquiry under the Brunner test is whether additional circumstances exist indicating that the present inability to pay will persist "throughout a substantial portion of the loan's repayment period." Nys, 446 F.3d at 945. It is presumed that the debtor's income will

---

[13] The Plaintiff's loans have interest rates of between 3.28 and 10.25 percent. (Pl. Trial Brief, ECF No. 39).
[14] Even if the interest rate were two percent for all loans, this would require a monthly payment in excess of $1,920 over the next 25 years to pay the loans in full. If the Plaintiff committed her entire adjusted net income of $1,850, she could repay the loans with two percent interest by the time she reached the age of 71, after some 26 years of payments.
[15] The Plaintiff offered no evidence at trial of the actual monthly payment amounts for the loans but did testify she was unable to pay the loans in full.

MEMORANDUM DECISION - 20

increase to a point where it is possible to repay the loans, but "the debtor may rebut this presumption though a showing of 'additional circumstances' indicating that her income cannot reasonably be expected to increase and that her inability to make payments will likely persist throughout a substantial portion of the loan's repayment period." <u>Nys</u>, 446 F.3d at 946. To aid in this determination the Ninth Circuit has adopted 12 non-exhaustive factors that may allow a debtor to show "additional circumstance" to rebut the presumption of an improving financial situation. The factors are:

> [(1)] Serious mental or physical disability of the debtor or the debtor's dependents which prevents employment or advancement; [(2)] The debtor's obligations to care for dependents; [(3)] Lack of, or severely limited education; [(4)] Poor quality of education; [(5)] Lack of usable or marketable job skills; [(6)] Underemployment; [(7)] Maximized income potential in the chosen educational field, and no other more lucrative job skills; [(8)] Limited number of years remaining in [the debtor's] work life to allow payment of the loan; [(9)] Age or other factors that prevent retraining or relocation as a means for payment of the loan; [(10)] Lack of assets, whether or not exempt, which could be used to pay the loan; [(11)] Potentially increasing expenses that outweigh any potential appreciation in the value of the debtor's assets and/or likely increases in the debtor's income; [(12)] Lack of better financial options elsewhere.

<u>Nys</u>, 446 F.3d at 947 (internal citation omitted). The point of this analysis is to determine whether the debtor is purposely choosing to live a lifestyle that prevents repayment of the loans. <u>Id.</u> at 946.

The Defendants suggest that the operative repayment period when applying the second <u>Brunner</u> prong is the termination of a theoretical IBR program. Depending on how a court applied this analysis, the IBR payment period could tack on an additional 25 to 30 years to the repayment terms without any consideration of the time a borrower has been under an obligation to make payments. There is a dearth of authoritative caselaw to guide the Court's analysis as to the appropriate repayment period, for purposes of the second <u>Brunner</u> prong. <u>Price</u>, 573 B.R. at 607 (collecting cases and utilizing the contractual loan period). The parties did not address the issue of the relevant loan repayment period and the Plaintiff did not

submit any evidence of when her loans were contractually due. Given the sparse record, the Court will use the standard amortization period for Direct Loans of ten years. 34 C.F.R. § 685.208(b)(1).[16]

Though a licensed member of the Washington State Bar Association, the Plaintiff is currently working as a waitress at the Muckleshoot Casino. The Plaintiff credibly testified that her employment as a waitress is reasonable given the needs of her dependents because it allows her to work on nights and weekends while offering excellent medical benefits. On these facts, the Court cannot fault the Plaintiff for her decision not to use her law degree.

The Plaintiff's previous work history as an attorney did not result in sufficient income to repay her student loans and take care of her dependents. Instead, the Plaintiff's employment history demonstrates that she is likely earning more with benefits than should could through practicing law. Although the Plaintiff did indicate a general desire to revive her law practice if she were ever able to do so, there is no indication of when this could occur because the triplets will not reach the age of 18 for another decade. The Plaintiff also received her real estate broker's license in the last two years and has sold at least two homes resulting in modest commissions. Based on the record, it does not appear that the Plaintiff's activities as a broker will provide a significant source of income over the next several years. The Court agrees with the Plaintiff's assessment that she will need to remain available to assist her dependent children and that this situation will continue for at least the ten year period if not beyond. (DOE Ex. 6).

It is evident that Plaintiff's circumstances will not change substantially to allow her to make the payments necessary to retire the full amount of the student loan debt by the end of

---

[16] The Plaintiff's loans are likely eligible for a variety of payment options, such as the extended repayment schedule available to borrowers with loans exceeding $30,000, which would be up to 25 years. 34 C.F.R. § 682.209(a)(6)(ix). However, the parties did not provide any evidence that the Plaintiff was enrolled in anything other than the standard repayment schedule.

MEMORANDUM DECISION - 22

the ten year period. The Plaintiff has very little in the way of assets available to pay the student loan creditors, leaving prospective income as the only source of repayment. The Plaintiff is also without retirement savings and will be over the age of 55 at the end of ten years. The serious mental and physical issues of the Plaintiff's four dependent children prevent her from substantially increasing her current income and also limit her options for employment beyond what she has been able to obtain. The future prospects do not look brighter since her current situation does not result in her obtaining equity in Rohde's house, although his assistance does eliminate certain major expenses and promises significant child care and emotional support. The Plaintiff has satisfied the second prong of the <u>Brunner</u> test.

  C. <u>Good Faith</u>

  The Court's final inquiry under the <u>Brunner</u> test is whether the Debtor has made a good faith effort to repay the student loans. <u>In re Pena</u>, 155 F.3d at 1111. A debtor's good faith is measured by "efforts to obtain employment, maximize income, and minimize expenses." <u>Penn. Higher Educ. Assistance Agency v. Birrane (In re Birrane)</u>, 287 B.R. 490, 499 (9th Cir. BAP 2002) (internal quotation marks and citation omitted). The court should also examine whether the debtor made any payments before filing for bankruptcy, the history of deferments and forbearances, and whether the financial condition resulted from factors beyond the debtor's control. <u>Roth v. Educ. Credit Mgmt. Corp. (In re Roth)</u>, 490 B.R. 908, 917 (9th Cir. BAP 2013). The mere fact that a debtor has not entered into an IBR program is not determinative. <u>Id.</u> at 919-20.

  The Defendants argue that the Plaintiff has not made a good faith effort to repay her student loans because she has not pursued enrollment in an IBR program, has made *de minimus* payments on the loans, and has spent financial surpluses on trips. The Court rejects these arguments and finds that the Plaintiff has made a good faith effort to repay her loans.

1.  *Lack of loan payments*

Two of the Defendants' concerns—the payments and the spending of additional surplus funds—are readily dealt with. The Plaintiff just completed a three-year Chapter 13 plan. During this time, the Plaintiff was not allowed to make payments to her unsecured student loans except as otherwise provided in the plan. As a result, the funds received by the Defendants from the Chapter 13 Trustee represent what the Plaintiff was allowed to pay and presumably what she could afford to pay in the context of her bankruptcy.

Prior to filing bankruptcy, the Plaintiff explained that the unexpected birth of triplets with significant, immediate healthcare needs made it impossible for her to make payments on the loans. During this same period of time, the Plaintiff also separated from her husband and both parents experienced periods of unemployment. Although the Plaintiff's present circumstances indicate additional income to fund repayments, this state of affairs is a recent occurrence. Even assuming the Plaintiff could have kept one of her numerous loans current through payments of any surplus income, such a use of funds would have been foolish. Some of the Plaintiff's loan obligations are to private lenders. Unless the Plaintiff were able to prevent collection actions from all lenders at the same time, any payment made to keep one loan current would not satisfy the other loan obligations. It is no solution at all to pay one lender just to invite collection actions from the others.

The Plaintiff's uncontroverted testimony regarding how she spent financial surpluses also supports her good faith. The "surplus" funds the Plaintiff received came in the form of tax refunds. The Plaintiff used these refund checks to bring monthly bills current and for expenditures that she anticipates will lower expenses, such as upgrades to the current heating system. (DOE Ex. 6 at 28). The evidence establishes that the Plaintiff's infrequent trips were largely paid for by family members, and there is no contrary evidence that these

MEMORANDUM DECISION - 24

trips cost substantially more than the ordinary amount the Plaintiff would have spent to feed her family in any given day.

   2. *Failure to apply for an IBR payment plan*

The Defendants place considerable weight on the Plaintiff's rejection of an IBR program. It is important to distinguish between investigation and actual enrollment in a loan repayment program. The law does not require actual participation in an IBR program but it does mandate some investigation and explanation for why a student loan debtor chooses to not participate. <u>Roth</u>, 490 B.R. at 917. In this instance the parties made a great deal about the potential for the Plaintiff to experience cancellation of indebtedness income at the end of the IBR period. This is entirely speculative because it would require that the Plaintiff acquire greater assets than she has debts. 26 U.S.C. § 108(a)(1).[17] This speculation is unsupported since no party presented any evidence in support of the respective arguments. In her closing argument, the Plaintiff clarified that she was not dissuaded from enrolling in the IBR program solely because of future tax consequence, but because her payments under the program would amount to $0.00 and would not advance her financial future on account of the existence of multiple lenders, including two private lenders.

The Plaintiff credibly testified that she did investigate the IBR program approximately one year before filing the complaint after her bankruptcy attorney told her about the options available for her student loans. The Plaintiff's explanation for not enrolling in any of the IBR programs is that the payment plans offered would result in a $0.00 payment. This is not a repayment of the loan under any scenario but is instead a wait-and-see approach from the lenders while the loan balances continue to increase. The Plaintiff credibly testified as to her concern that the ever-increasing loans would limit her ability to prepare for the future for

---

[17] "Gross income does not include any amount which (but for this subsection) would be includible in gross income by reason of the discharge (in whole or in part) of indebtedness of the taxpayer if . . .the discharge occurs when the taxpayer is insolvent . . . ." 26 U.S.C. § 108(a)(1)(B).

MEMORANDUM DECISION - 25

herself and her children and to care for them at present. The Court finds that based on the evidence, the Plaintiff has made a good faith effort to repay her student loans.

       D.  <u>Partial Discharge of the Educational Loans</u>

Where the Plaintiff satisfies the three <u>Brunner</u> prongs, the Court may order a discharge of any portion of the debt that would impose an undue hardship. <u>Saxman</u>, 325 F.3d at 1175. Though <u>Saxman</u> acknowledges the equitable power of the bankruptcy court to partially discharge student loans, it offers little guidance on how to accomplish this. <u>See</u>, <u>e.g</u>, <u>Bossardet v. Educ. Credit Mgmt. Corp. (In re Bossardet)</u>, 336 B.R. 451, 459 (Bankr. D. Ariz. 2005) (partially discharging principal, reducing principal balance, reducing the interest rate, and changing the loan term); <u>Ayele v. Educ. Credit Mgmt. Corp. (In re Ayele)</u>, 468 B.R. 24, 36 (Bankr. D. Mass. 2012) (order prospective bankruptcy discharge to avoid tax consequences). The end result is that the bankruptcy court retains discretion to determine the amount and manner of a partial discharge of a student loan pursuant to § 523(a)(8).

       1.  *The Plaintiff is entitled to a partial discharge of her student loans.*

The Plaintiff in this case has met her burden to establish that she cannot, without undue hardship, repay the more than $415,000 owed to the Defendants. However, the Court finds that the Plaintiff does have present net income of $1,850 after making adjustments as described above. If the Court projects this figure out for the remaining ten years of a standard repayment program, the Plaintiff would need to repay a total of $222,000 of the Defendants' loans. In ten years the Plaintiff will be 55 years old and with some time left in her working life. However, at least one of the Plaintiff's children is likely to remain with her as a dependent at this point, and the remainder of her earning years presents an opportunity to save something for retirement besides her minimal Social Security income. The Court is convinced that the Plaintiff's diligence and showing of fortitude will result in her making a good faith effort to repay the remaining student loan obligations. Based on the Court's calculations, each

MEMORANDUM DECISION - 26

Defendant's pro rata share of the remaining student loan obligations is as follows: ECMC-$123,520.80; DOE- $88,400.40; and Pacific- $10,078.80.[18]

2. *The Plaintiff has not established any basis for further reduction of the surviving amount of student loan obligations.*

A partial discharge of student loans is not an exact science because it requires the Court to speculate to some extent about the borrower's future. At trial the Plaintiff argued that the Court should consider certain additional changes to her finances when determining the dischargeability of her student loans. Specifically, the need for a wheelchair accessible van for her dependent daughter and the termination of child support. As the Court already indicated in its analysis of the second <u>Brunner</u> prong, excluding the annual tax refund from the calculation of net income provides a source of money for larger necessary expenses, including a replacement vehicle. Additionally, to the extent the Plaintiff recovers any money from her auto accident, these funds may be used for repayment. Therefore, the Court will not make an adjustment for a new van or the other undefined expenditures the Plaintiff claims she will need to make in the future and these expenditures will need to be paid from the tax refunds.

The evidence presented as to the termination of child support is also insufficient to support reducing the net income further for purposes of determining the amount the Plaintiff can pay over the next ten years. No party presented any evidence of when the child support ceases completely or how it would be offset by changes in expenses. From the bank statements admitted into evidence it appears that child support is approximately $1,400 of the $2,566 of SSI and child support income. (DOE Ex. 8). The Plaintiff did testify that she will lose $550 of child support attributable to her oldest son when he turns 18 in less than two years. On the other hand, the Plaintiff would also presumably see a reduction in expenses as

---

[18] The Court calculated the pro rata share of each loan from the original <u>principal</u> amount received as evidence at trial. (ECMC 3, DOE 1A, PAC 5). From the Defendants' exhibits, the principal balance owed to ECMC was $171,716 or 55.64%; to DOE $122,901.12 or 39.82%; and to Pacific, $14,000 or 4.54%. The use of the principal amount avoids any inequity in differences between how the Defendants calculate and capitalize interest, or charge expenses.

MEMORANDUM DECISION - 27

children leave the house, as two of her eldest children have already done. Therefore, the Court will not reduce the net income available for on this basis.

The Plaintiff is an intelligent and able individual who has capably dealt with the significant challenges posed by the many needs of her disabled children. Though $222,000 is a large amount, the Court's partial discharge of her student loan obligations will hopefully provide the Plaintiff with some hope and ability to pay the student loans within her working life while still being able to care for her children.

Finally, the Plaintiff testified at trial that she was concerned the potential tax consequences following completion of an IBR plan would negate any advantage of her participating in the program. The Court will not discourage the Plaintiff from participating in a repayment program for her student loans but will not reduce the remaining loan balance further based on this asserted concern. The Plaintiff's tax concern is speculative and based on an assumption that she will fail to repay the loans and that she will acquire sufficient assets to create taxable income under the insolvency provision of 26 U.S.C. § 108. No evidence was presented as to the likelihood of a taxable event should the Plaintiff choose to participate in a repayment plan so the Court will not speculate on such liability. Therefore, the Court will discharge, pro rata, the portion of the Plaintiffs' student loan obligations owed to the Defendants to the extent the amount owed exceeds $222,000. The Plaintiff shall pay this amount pursuant to whatever terms the Plaintiff and Defendants may agree. The Court does not find it appropriate at this time to set the repayment terms and hopes that the parties will be able to come up with terms that are reasonable. The Court's decision is, however, without prejudice to the Plaintiff's ability to participate in any current or future repayment program offered by any of the Defendants, or otherwise available, for which she is eligible or to resolve issues with the payment terms through mediation or other settlement means.

///End of Memorandum Decision///